# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

GLORIA ANDERSON,

      Plaintiff,

v.

THE MERCER COUNTY SHERIFF'S
DEPARTMENT, et al.

      Defendants.

Civil Action No.: 11-cv-7620 (PGS)

MEMORANDUM AND ORDER

SHERIDAN, U.S.D.J.

This matter is before the Court on a motion for summary judgment brought by Defendant,

The Mercer County Sheriff's Department (ECF No. 195).

### I.

On December 30, 2011, Plaintiff filed the original Complaint in this action as a *pro se*

Plaintiff, naming eleven defendants. (ECF No. 1).[1] On June 15, 2012, Judge Pisano entered an

order dismissing the State of New Jersey. Plaintiff filed an Amended Complaint on July 16, 2012,

asserting claims against Mercer County Sheriff's Office, the County of Mercer, the Mercer County

Administrator, and PBA Local 187.  On February 28, 2013, Judge Pisano dismissed all of the

Defendants, except the Mercer County Sheriff's Office and PBA Local 187.  Judge Pisano

thereafter dismissed all claims against the PBA Local 187 on January 29, 2015. (ECF No. 111).

As such, Mercer County Sheriff's Office is the sole remaining Defendant in this action.  The

Sheriff's Office now moves for summary judgment on the remaining claims of: Title VII, Race

Discrimination (Count I), Gender Discrimination (Count VIII); and Retaliation (Count II); and the

---

[1]      Plaintiff filed an EEOC complaint on December 31, 2010, in which she alleged that she had been denied certain desired assignments and overtime as a result of her race and gender. *See* ECF No. 37, pg. 8.

(Conscientious Employee Protection Act CEPA), based only on alleged retaliatory events that occurred after December 30, 2010 (Count IV).

The Amended Complaint consists of 61 paragraphs of alleged facts, followed by the eight Counts, four of which remain. Within the 61 paragraphs of alleged facts, the Amended Complaint depicts various incidences of alleged adverse treatment in connection with Plaintiff's employment. Plaintiff also contends that Officers "less senior" than her were treated more favorably[2], that she was sexually harassed, and that she was denied over-time hours and pay for retaliatory reasons.

The Amended Complaint is not precise and it is difficult to assess how each alleged incident is related to the alleged causes of action. In addition, Plaintiff asserts more alleged incidents of discriminatory conduct in her opposition to the summary judgment motion than were originally asserted in the Amended Complaint. In light of same, each incident is reviewed separately below.

## II.

Generally, Plaintiff began her employment with the Mercer County Sheriff's Office in 1992 and retired in 2014. She was a member of the PBA Local 187 Labor Union. Plaintiff was assigned to the Child Support Hearing Officers at the Mercer County Courthouse in Trenton, New Jersey for twelve years.

Corbin Incident (Amended Complaint ¶¶ 9-14.)

On September 24, 2009, Christopher Corbin allegedly insulted Plaintiff on a staff transport bus by "calling her an offensive name in a disdainful and demeaning manner in the presence of county staff and her fellow Sheriff Officers." Discovery revealed that Plaintiff, in a memorandum to Lt.

---

[2]     By use of the words "less senior," Plaintiff may be inferring an age discrimination claim or a breach of the collective bargaining agreement – no such cause of action was alleged.

Samonski alleged that Officer Corbin said to Plaintiff, "Don't call me on the speaker phone," and allegedly told her that she must be "stupid". (Kemler Cert. ¶ 32 Ex. 10).

According to Plaintiff, the incident was initially reported to the sergeant on duty, Sergeant Harold Fowler, an African American officer. Thereafter, the investigation was assigned to Sergeant Patakula. Plaintiff was upset with this change of the investigator because according to her, Sergeant Patakula was a "white" friend of Officer Corbin. Plaintiff further alleges that Patakula did not conduct a thorough investigation. According to her Complaint, Patakula accused Anderson of being too polite, and told her that he would instruct Corbin to behave respectfully and professionally toward her. On October 13, 2009, Plaintiff wrote a memorandum to Lieutenant Patricia Samonski regarding her dissatisfaction with the investigation. She did not receive an answer. On December 4, 2009, Plaintiff wrote a letter to Kevin Larkin, then Mercer County Sheriff, regarding the Officer Corbin incident.

Special Accommodations and Overtime (Amended Complaint ¶¶ 15-17; ¶¶ 38-40)

Within the December 4, 2009 letter to Sheriff Kevin Larkin, Plaintiff also complained about alleged unfair distribution of overtime. Plaintiff alleges "special accommodations," including extra overtime, training and promotion opportunities, which Anderson claimed were special privileges, were "reserved for white officers", and that black officers were never assigned these "special privileges." According to Plaintiff, Larkin did not respond to the letter; but in December 2009 she was allegedly interviewed in an intimidating manner and instructed to keep her complaints on the "down low" and not hire an attorney.[3] (Andersen Cert. ¶46).

In early 2010, Plaintiff was transferred to the Criminal Courthouse which allegedly denied her an opportunity to work overtime. She points specifically to Officer Darryl Taylor who

---

[3]     Plaintiff does not identify who interviewed her in an intimidating manner.

allegedly consistently allowed "white officers" to work overtime but denied Plaintiff. Plaintiff was also allegedly denied overtime by Sergeant Charles Wert. (Amend. Compl. ¶38-40). The Amended Complaint does not explain the circumstances of how this occurred. Plaintiff was moved back to the Civil Courthouse building at 175 Broad Street in 2011 and again reassigned to the Criminal Courthouse in 2012.

Transfer to Criminal Court (Amended Complaint ¶ 18-29).

In December 2009, Plaintiff began hearing rumors that she would be transferred from her long-term assignment with the Child Support Hearing Officers at the courthouse. Plaintiff alleges that the transfer to the criminal courthouse was in retaliation for the complaints in her letter to Sheriff Larkin about disparate treatment of African American Sheriff Officers.

Anderson requested to stay in her former assignment, but her request was denied. Plaintiff was transferred to the Criminal Courthouse on January 4, 2010. Allegedly, Plaintiff was replaced by a white officer who had less seniority than her. In addition, she avers that two white officers similarly requested that they not be transferred to the Criminal Courthouse, and their requests were granted.

Defendant rebuts these accusations, noting first, that there were fifteen officers including Plaintiff who were transferred, and those officers were of diverse backgrounds. Second, Defendant explains that such re-assignments are made twice a year in January and July. Third, in a letter dated January 21, 2010, Sheriff Larkin explained that two officers (Officer Perez and Bonifazi) were continuing in their assignments in the Civil Courthouse at the request of the Superior Court Judges to whom they had been assigned. Another officer, who was not transferred, had presented a letter from a physician indicating that reallocation to the Criminal Courthouse would exacerbate his existing health condition.

<u>Medical Reasons for Request not to be Transferred</u> (Amended Complaint ¶ 30).

Plaintiff also alleges that Defendant knew that the Criminal Courthouse was "medically unsafe", but that she was transferred there anyway. Plaintiff alleges that exposure to asbestos was causing her to have some medical issues. According to Plaintiff, in April, 2012, her physician advised her that she should not work in a building contaminated with asbestos, and Plaintiff allegedly submitted a note from her physician regarding same[4]. According to Plaintiff, after she delivered the note from her doctor, Undersheriff Ellison, an African American officer, and Defendant Richard Piotrowski asked her to surrender her weapon and report to the county's doctor to see if she was fit for duty. (Amended Complaint ¶57-59). Plaintiff alleges that she was forced to walk to the doctor's office without her weapon or uniform. She alleges that this command placed her in danger from detainees and it was mandated as a means of retaliating against her for filing her doctor's note. (*Id.*)

Defendant rebuts this allegation by noting that all officers are required to store their service weapon at the Sheriff's office prior to visiting the County doctor. As a matter of policy and safety, officers are prohibited from bringing weapons into the doctor's office. (Ellison Cert. ¶6). Further, Defendant rebuts that Plaintiff was not forced to walk, or placed in danger, but was instead driven to the parking garage to obtain her personal vehicle, which she drove to the County Doctor. (Ellison Cert. ¶7).

After being examined by the County doctor, Plaintiff did not return to work for a few days due to high blood pressure. When she returned, she had a note from her personal physician clearing her to return to work. (Ellison Cert. ¶9).

---

[4] There is no evidence, medical records or expert reports submitted to support Plaintiff's claim regarding her health issues.

<u>Sexual Harassment Claim</u> (Amended Complaint ¶ 41-53)

Plaintiff's claim of sexual harassment relates to an incident that occurred in July, 2011, when she was working at the back security door entrance to 175 Broad Street building, on the ground floor. At that time, a revealing photo of a woman from the local newspaper (commonly referred to as a "page 6 photo") was placed on her worksite. Plaintiff requested that the incident be investigated, as there were cameras in that area. Plaintiff informed her supervisor, Sergeant Seth Barton, who confiscated the photo and refused to provide her with a copy, but instead instructed her to write a memorandum about the incident. As she typed the memo, Plaintiff requested computer assistance from one of her fellow Officers; however, he denied Plaintiff's request because he had been instructed by Sergeant Patukula not to assist Plaintiff. Plaintiff completed her memo and the case was assigned to internal affairs. On July 20, 2011, Plaintiff was interviewed by Sergeant Nolan about the incident. Plaintiff was again interviewed on August 10, 2011. During that interview, she claims she was coerced and threatened into rewriting her original statement. She was told that if she refused to rewrite the statement she would be charged with insubordination. There are no recordings or transcripts of this interview. On September 2, 2011, Plaintiff was charged with making a false statement, based on the re-written statement, and was threatened with a five days suspension. After a hearing, the disciplinary charges were dismissed.

The Officer responsible for placing the photo at Plaintiff's work station, Officer Jeffrey Ficarro, was reprimanded. (Kemler Cert. ¶54; Exhibit 26).

<u>Seniority Allegations</u> (Amended Complaint ¶55; 61)[5]

Plaintiff argues that she was denied assignments that she requested in 2012. She argues that her name was removed from the bidding sheet wherein a Sheriff Officer may request

---

[5]     See footnote 1. Plaintiff has not alleged an age discrimination claim.

assignments. Plaintiff alleges that the requests of the white officers with less seniority were maintained on the bidding sheet, while her requests were not. Plaintiff alleges that her name was also removed on a second occasion in June 2012, and that the positions she had requested were ultimately assigned to white male officers with less seniority. In response, Lieutenant Schoellkopf testified that Plaintiff never signed up for those assignments.

Plaintiff alleges that the practice of shift-bidding has a discriminatory effect (Anderson Cert. ¶79; Amend Comp. ¶54-56) because it allows the Sheriff to assign any officer regardless of seniority to jobs that afford tremendous overtime and training opportunities. (Anderson Cert. ¶80).

Defendant explains that the shift bidding process is a semi-annual process in which Sheriff's Officers the Court Division bid for shift assignments, but not the specific duty assignment. The assignment of such a request is based upon seniority. (Kemler Cert. ¶8-10). Defendant contends that Plaintiff attempted to choose her specific duty assignment through the bidding process. The Sheriff's Office deemed this to be improper. (Kemler Cert. ¶10). For that reason, her requests for specific duty assignments were removed from the shift-bidding sheets. (*Id.*).

Evidence of Discriminatory Assignment of Overtime Hours

Plaintiff alleges that she was discriminated against because white officers received overtime hours, while black officers did not. In order to substantiate her claim, Plaintiff annexes three exhibits entitled "Black Officer's Overtime Hours" (Rider A), "White Officer's Overtime Hours" (Rider B) and a listing of officers by the section to which each was assigned (for example, transportation, internal affairs, detective and airport). Within this list, Rider C is a section of the list referring to transportation officers for the year 2016. Plaintiff's allegations are analyzed against the annexed Riders.

In Ms. Anderson's certification, Plaintiff makes a conclusory allegation that "white officers earn more on average than black officers." The source of this conclusion is derived from Riders A and B.

Rider A is an unauthenticated document. There is no proof that it contains an accurate listing of all black officers, or that it accurately records the overtime hours. Plaintiff calculates a simple average by adding all overtime hours of Black officers together, and then dividing it by the number of black officers. Assuming the math is correct, Plaintiff finds that the average number of overtime hours for black offices for the year 2009 is 82, and 62.5 hours for 2010.

Plaintiff then calculates the average overtime hours for the white officers (Rider B). Utilizing the same method as described above, Plaintiff concluded that the average number of overtime hours for white officers was 118 hours in 2009, and 94 hours in 2010.

In comparing the overtime hours of black officers to white officers in 2009, white officers averaged more overtime (82/118); and similarly in 2010, white officers had more overtime hours (62.5/94). Plaintiff thereby concludes that an average black officer had fewer overtime hours. However, this comparison is faulty. The comparison does not factor in certain variables. For example, there may have been an extraordinary case being held at the Courthouse requiring extra personnel, or certain personnel may have been assigned special duties based on judges' preference. In addition, the charts do not distinguish the officers by rank, which could also be a factor to explain the additional overtime. Moreover, the facts relied upon may be in error. For instance, Plaintiff focused on overtime hours for officers in the transportation section (discussed below) but when comparing Rider C to the white officers' overtime hours in Rider B, two officers (Kelly Gogan and Tara Hendryx) listed in Rider C do not appear on either Rider A or Rider B. Plaintiff does not provide an explanation for this difference. In conclusion, the statements and exhibits

presented by Plaintiff regarding the average hours of the officers are so imprecise that they cannot be relied upon.

In Ms. Anderson's certification, she asserts for the first time in the litigation, that in 2009 she was assigned to the transportation unit where she worked 101 hours of overtime. She asserts that the transportation assignment with the Mercer County Sheriff Office is an assignment where officers are able to accrue a great deal of overtime; and that her transfer caused her to lose a great amount of overtime hours and pay. Plaintiff supports these assertions by relying upon a document entitled "hourly history detail" (Rider D). Rider D shows that Plaintiff had 101.5 hours of overtime in 2009, and 52.5 hours in 2010. Both pages are captioned as "constitutional/sheriff/public safety salaries." There is no reference to the transportation unit employees on either page. Moreover, if one compares Ms. Anderson to the other officers who she identifies as white (w), it does not show any pattern of overtime hours being assigned to white officers. In fact, Anderson had more overtime than some officers, and less than others. For example:

|  | 2009 | 2010 |
|---|---|---|
| Allen[6] | 19 | 0 |
| Altobelli (w) | 43.5 | 0 |
| Anderson (b) | 101.5 | 52.5 |
| Armano (w) | 255.5 | 199.5 |
| Armetage (w) | 72.0 | 30.0 |
| Barato (w) | 62.0 | 53.0 |

In conclusion, the charts submitted to establish discriminatory conduct do not show any such conduct; and accordingly lack merit.

---

[6]     Allen is not identified by race.

**LEGAL STANDARD**

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co*., 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson,* 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue of material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.,* 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue of material fact. *Anderson,* 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc*., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp*., 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to set forth specific facts showing that there is a genuine issue for trial"). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor "that no

reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. App'x. 222, 227 (3d Cir. 2007).

Race and Gender Discrimination

Plaintiff alleges that the Sheriff's Office committed race and gender discrimination by failing to assign overtime hours to female and black officers. Both causes of action for race and gender discrimination are analyzed under the same standard. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later clarified in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *see also Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999) (Analysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim.). *McDonnell Douglas* has a burden shifting three step process. *Hicks*, 509 U.S. at 506. Here, Plaintiff does not meet the first step, failing to set forth a prima facie case. This step is reviewed below.

To establish such a prima facie case, Plaintiff must show that (1) she is a member of a protected class; (2) she is qualified for the position in question; (3) she suffered from an adverse employment decision; and (4) the employer sought to or did fill the position with a similarly qualified person who was not a member of the protected class. *McDonnell Douglas*, 411 U.S. at 802.

Plaintiff meets prongs one and two of the test, as she is black and female, and she has performed satisfactory work. Plaintiff fails to meet prong three since she has not shown an adverse action.

Title VII specifically prohibits actions which would "deprive or tend to deprive any individuals of employment opportunities or otherwise adversely affect his status as an employee." 42 U.S.C. § 2000e-2(a). The Supreme Court has defined a tangible, adverse employment action as

a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 749, 3 (1998). *See Weston v. Pennsylvania*, 251 F.3d 420, 430-431 (3rd Cir. 2001). A transfer or demotion may suffice to prove an adverse employment action. *See Jones*, 198 F.3d at 412; *See, e.g., Torre v. Casio, Inc.*, 42 F.3d 825, 831 n.7 (reversing the District Court's grant of summary judgment and recognizing that a job transfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse job action); *see also McGrenaghan v. St. Denis Sch.*, 979 F. Supp. 323, 326 (E.D. Pa. 1997) (also holding that a job transfer even without loss of pay or benefits may constitute an adverse job action where the terms, conditions or privileges of employment vary). Nevertheless, Plaintiff must still prove that such adverse action was motivated by discriminatory reasons.

As noted above, Plaintiff relies on two different theories to show an adverse action. First is a comparison of overtime hours between white officers and black officers; and second, by comparing transportation section employees to black officers. Plaintiff's claim is that she was denied overtime hours which white officers received. Her proofs do not demonstrate this. As set forth above, the average hours of overtime between white and black officers (Riders A and B) are based on an unauthenticated document. Rider C shows two officers (Kelly Gogan and Tara Hendryx) who do not appear on Riders A and B. As such, the argument set forth through the Riders lacks substance.

Plaintiff's second argument is that the Sheriff's Officers within the transportation section are mainly white officers, and that those officers receive more overtime than black officers. Plaintiff alleges that in 2009 she was assigned to the transportation section and that she worked 101.5 hours of overtime, and in 2010, after being transferred to the Court section, she had 52.5

hours of overtime. Plaintiff relies on Rider D, a document that lists employees as "constitutional/sheriff public safety salaries," but there is nothing that compares transportation section employees to black employees. As such, the documents relied upon, and alleged facts therein, do not sufficiently explain the claim.

There is a second reason to deny the claim. Plaintiff's argument about the transportation unit was first raised in her opposition to this motion for summary judgment and again at oral argument. It was never raised in the Amended Complaint, and was not disclosed during discovery. Defendant argued in its brief that "it would be unfair to now allow Plaintiff to base that claim on entirely different facts and theories." *J. Lloyd Int'l, Inc. v. Testor Corp.*, 2010 U.S. Dist. LEXIS 13414, *16-18 (Iowa, February 17, 2010); *See N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) ("[W]hile we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment."); *see also Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) (rejecting plaintiff's attempts to "expand his claims in his brief" by asserting facts not raised in the complaint). Here, Defendant has a meritorious argument, and it is far too late to bring this new theory into the case when it has been pending for more than five years.

In conclusion, Defendant's motion for summary judgment based on race and gender discrimination is granted.

<u>Retaliation</u>

Plaintiff argues that she was retaliated against after she (1) completed a survey and answered "yes" when asked whether there was discrimination in the Mercer County Sheriff's

Office; and (2) submitted a letter about overtime abuse in the Mercer County Sheriff Department, after she filed a sexual harassment complaint against Officer Corbin.

According to Plaintiff, the retaliatory action was her transfer from the Civil Courthouse (later argued to be a transfer from the transportation section) to the Criminal Courthouse. Other alleged retaliatory actions were: being deprived overtime, and being placed in danger by management requiring her to leave her weapon at headquarters while attending an appointment with a doctor retained by Mercer County.

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) she engaged in an activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (citation omitted). The burden shifting framework follows the same three steps as presented above.

Defendant argues that Plaintiff failed to meet the requirements for a retaliation claim. Plaintiff argues that the December, 2009 letter to Sheriff Larkin is the protected activity, at which time she raised concerns about special accommodations for white officers. For the "adverse employment action" element, a plaintiff must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. (quoting *Burlington Northern & Santa Fe Ry. Co., v. White*, 548 U.S. 53, 67 (2006)) (explaining that the "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm"). Here, Plaintiff argues that the adverse employment action is that she was transferred from the transportation section or the Child Support Hearing Officers section

to the Criminal Courthouse. To establish the third element, "a plaintiff must show a causal connection between the plaintiff's opposition to, or participation in proceedings against, unlawful discrimination, and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination". *Burlington Northern & Santa Fe Ry. Co., v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). Additionally, a plaintiff must show that the temporal proximity of the protected activity and the employment action is "unduly suggestive." D*eans v. Kennedy House, Inc.*, 587 F. App'x 731, 735 (3d Cir. 2014) (citing *Williams v. Phila. Hous. Auth. Police Dep't,* 380 F.3d 751, 760 (3d Cir. 2004)) (finding that the plaintiff's termination more than two months after he filed his second EEOC charge not so close as to be unduly suggestive).

Here, Plaintiff sent a letter to Sheriff Larkin regarding the alleged discrimination in overtime distribution on December 4, 2009. She allegedly "expressed [her] frustration regarding the disparate treatment of African American Officers with respect to un-posted assignments that white officers were permitted to receive, lack of training opportunities for African American officers, extra overtime for white favored officers, and 'no lunch overtime' instituted specifically to give extra money to white officers." (Anderson Cert. ¶26; *see also* Amend. Comp. ¶15). She began hearing rumors of her transfer in December, 2009. She does not specify whether that was early or late in the month. She was transferred in January 2010. The facts as presented by Plaintiff may suggest a temporal connection. However, Plaintiff has failed to disprove the legitimate explanations presented by Defendant with facts that could lead a reasonable jury to "determine that [Defendant]'s stated reason . . . is pretextual." *Borgese v. Dean Foods Co*., 2017 U.S. Dist. LEXIS 98803, *14, 2017 WL 2780742 (D.N.J. June 26, 2017). For example, Defendant explained

that transfers usually occur in January and July, and that fifteen other officers were transferred at the time Plaintiff was transferred.

Overall, Plaintiff has not provided any direct evidence of retaliation and candidly, her facts appears to be amiss because it is unclear whether Plaintiff worked at the Child Support Hearing Officer's section, or at transportation in 2009. Further, the transfer alone is not necessarily enough to show retaliation, nor sufficient by itself to show an adverse action. The Court recognizes that a supervisor's requirement that an employee perform an undesirable aspect of the job more than other employees may be considered adverse employment action. *See Moore v. Beers*, 2017 U.S. Dist. LEXIS 17498, *14 (Feb. 8, 2017). The Supreme Court noted that "[a]lmost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage an employee. . . from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable." *Id*. (quoting *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70-71 (2006)). Nevertheless, Plaintiff's accusations without sufficient proof to show that Defendant's actions were motivated by illegitimate motives are not sufficient to maintain a claim for retaliation and establish a sufficient link. *Moore v. Beers*, 2017 U.S. Dist. LEXIS 17498, *14.

An essential job of every Sheriff's officer is to secure the criminal courthouse, like all other courthouses, where judges, jurors, witnesses and others appear for hearings. The assignment Plaintiff was asked to perform at the Criminal Courthouse fell under her job description. The basis for Plaintiff's retaliation claims are substantially the same as for her discrimination claim. Defendant presented a legitimate reason for Plaintiff's transfer and justified the timing of the transfer. Defendant also explained that Plaintiff had to leave her weapon behind when going to the

County doctor because that was required of all officers. Plaintiff failed to rebut with direct or circumstantial evidence that Defendant's reasons were a pretext. *See Kant v. Seton Hall Univ.*, 2008 U.S. Dist. LEXIS 638, *40 (D.N.J. Jan. 3, 2008). Based on the evidence provided, a reasonable fact-finder could not conclude that Plaintiff was transferred due to retaliatory reasons. Thus, the motion for summary judgment with regard to the retaliation claims is granted.

*CEPA Claim (Events after 2010)*

Plaintiff's CEPA claims are barred by the statute of limitations. The statute permits an aggrieved employee or former employee to institute a civil action in a court of competent jurisdiction within one year. N.J.S.A. § 34:19-5. Since the Complaint was filed on December 30, 2011, Judge Pisano ruled that any CEPA action occurring before December 30, 2010 was time barred. (February 28, 2013 Opinion of Judge Pisano, ECF No. 37, p. 14-15). In reviewing Plaintiff's brief, the Court notes that Plaintiff identifies the whistle-blowing activity on which her CEPA claim is based as "when she raised the issue of overtime abuse she was retaliated against by the transfer to the criminal court building" (Plaintiff's Brief in Opposition, p. 44). This reference is to Plaintiff's letter to Sheriff Larkin dated December 4, 2009, and Plaintiff's transfer to the Criminal Courthouse occurred on January 4, 2010. She does not point to the EEOC charge that was filed on December 31, 2010. Since the events on which her CEPA claim is based occurred prior to December 30, 2010, they are out of time.

CONCLUSION

Overall, Plaintiff has not submitted any plausible evidence of triable material facts that could lead a rational juror to find in her favor. Based on the above analysis, Defendant's summary judgment motion is granted.

ORDER

This matter having come before the Court on a motion for summary judgment brought by Defendant, The Mercer County Sheriff's Department (ECF No. 195); and the Court having considered the briefs and oral arguments of the parties; and for good cause having been shown;

IT IS on this 17th day of January, 2018;

ORDERED that Defendant's motion for summary judgment is granted.

_s/Peter G. Sheridan_
PETER G. SHERIDAN, U.S.D.J.

# RIDER A

## Black Officer's Overtime Hours

|  | Name | Overtime Hours 2009 | Overtime 2010 |
|---|---|---|---|
| 1 | Gloria Anderson | 101.500 | 53.500 |
| 2 | Robert Belin | 4.500 | 20.500 |
| 3 | George Bello | 221.500 | 234.500 |
| 4 | Frederick Brown | 0 | 0 |
| 5 | David Copeland | 75.500 | 41.500 |
| 6 | Anthony Conway | 31.500 | 21.750 |
| 7 | Donald Ellison | 148.000 | 100.000 |
| 8 | Howard Fowler | 69.500 | 48.000 |
| 9 | George Henderson¹ | 79.000 | 283.500 |
| 10 | Dywon D. Kelsey | 25.500 | 1.000 |
| 11 | Michael Orlando | 119.500 | 61.500 |
| 12 | John P. Smith | 18.500 | 49.500 |
| 13 | Troy Stevenson | 61.000 | 40.000 |
| 14 | Kenya Stocks | 84.500 | 67.500 |
| 15 | Darryl Taylor | 237.500 | 58.000 |
| 16 | Terrence Upshur | 123.000 | 12.500 |
| 17 | Carol Walton | 0 | 0 |
| 18 | Glen West | 0 | 32.000 |
| | **Total Overtime for Black Officers** | 1400.5 | 1125.25 |
| | **Average per Officer** | 82 | |
| | **Average per Officer** | | 62.5 |

# RIDER B

## White Officer's Overtime Hours

| | Name | Overtime Hours 2009 | Overtime 2010 |
|---|---|---|---|
| 1 | Phillip Altobelli | 43.500 | 84.000 |
| 2 | Joseph Armano | 255.500 | 204.500 |
| 3 | Bruce Armitage | 72.000 | 31.000 |
| 4 | Carmen Barbato | 62.000 | 55.000 |
| 5 | Seth Barton | 188.500 | 86.500 |
| 6 | Gregory Bezek | 277.500 | 403.500 |
| 7 | Joseph Bonfonti | 139.500 | 110.000 |
| 8 | Devin Bonifazi | 19.000 | 19.500 |
| 9 | Greg Bunting | 250.000 | 241.500 |
| 10 | James Ciprano | 109.000 | 1.000 |
| 11 | Christopher Clugsten | 25.000 | .500 |
| 12 | Shane Coderoni | 277.500 | 245.500 |
| 13 | Robert Conover | 111.000 | 24.500 |
| 14 | Christopher Corbin | 32.000 | 16.000 |
| 15 | Jerry Cox | 72.000 | 0 |
| 16 | Dominic Cunigiano | 28.000 | 13.000 |
| 17 | Stephen Demko | 181.500 | 69.500 |
| 18 | Paul Deworocki | 38.000 | 3.000 |
| 19 | Brian Dibiasi | 166.000 | 339.000 |
| 20 | Elizabeth Dibiasi | 64.000 | 25.000 |
| 21 | Mathew Dillon | 63.000 | 93.000 |
| 22 | Edward Dinatale | 71.500 | 11.000 |
| 23 | Christopher Drew | 335.500 | 278.500 |
| 24 | John Fasanella | 16.000 | 0 |
| 25 | Joseph Fedor | 302.000 | 273.000 |
| 26 | Jeffrey Ficarro | 138.000 | 112.500 |
| 27 | James Freeman | 122.500 | 76.500 |
| 28 | Michael Gerasomowicz | 0 | 0 |
| 29 | Robert Gioscio | 84.500 | 25.000 |
| 30 | Scott Burr | 157.000 | 144.500 |
| 31 | Steven Caruso | 154.500 | 183.500 |
| 32 | William Chalker | 203.500 | 267.000 |
| 33 | Jennifer Glazewski | 19.500 | 79.500 |
| 34 | Christopher Gregg | 117.000 | 30.000 |
| 35 | Harry Harbourt | 164.000 | 67.500 |
| 36 | Robert Hartpence | 109.500 | 91.000 |
| 37 | Jessie Henderson | 135.000 | 118.000 |
| 38 | Joseph Herrity | 0 | 0 |



| 39 | Ronald Hogg | 207.000 | 156.000 |
|---|---|---|---|
| 40 | Ryan Hoy | 74.500 | 109.000 |
| 41 | Jeffrey Jantos | 230.500 | 207.000 |
| 42 | Neil Jantos | 308.000 | 242.500 |
| 43 | Robert Kelly | 80.500 | 58.500 |
| 44 | John Kemler | 0 | 0 |
| 45 | Christopher Kenyon | 306.500 | 435.500 |
| 46 | Jeffrey Kostoplos | 63.500 | 52.500 |
| 47 | Kevin Larkin | 0 | 0 |
| 48 | William Larkin | 152.500 | 26.500 |
| 49 | Stas Laszcyk | 89.000 | 86.500 |
| 50 | Sean Lavin | 174.500 | 63.000 |
| 51 | Henry Lenartowicz | 2.500 | 9.500 |
| 52 | Allen Linkchorsk | 0 | 0 |
| 53 | Timothy Lockwood | 36.500 | 0 |
| 54 | Ralph Mackelvey | 77.500 | 33.000 |
| 55 | Christopher McKenna | 66.500 | 70.500 |
| 56 | Randy McVaugh | 127.500 | 65.000 |
| 57 | Phillip Meisner | 151.500 | 56.000 |
| 59 | Stephen Mellick | 103.500 | 31.500 |
| 60 | John Mendez | 77.500 | 1.500 |
| 61 | Joseph Mendez | 110.500 | 73.000 |
| 62 | William Miller | 108.500 | 56.500 |
| 63 | Kenneth Moretz | 0 | 0 |
| 64 | Nicolas Morgante | 251.000 | 381.500 |
| 65 | Carissa Mulryne | 0 | 0 |
| 66 | John Murkli | 188.500 | 57.500 |
| 67 | Suania Negron | 2.000 | 4.000 |
| 68 | James Nizolek | 257.000 | 194.500 |
| 69 | Carol Nolan | 130.500 | 59.599 |
| 70 | Linda Olenick | 153.000 | 62.000 |
| 71 | William Osterman | 22.000 | 0 |
| 72 | John Pacuta | 2.500 | 0 |
| 73 | Pasquale Papero | 299.500 | 191.250 |
| 74 | Jason Parent | 166.000 | 84.500 |
| 75 | Donald Patakula | 145.500 | 119.000 |
| 76 | George Peterson | 1.000 | 16.500 |
| 77 | James Petro | 37.000 | 26.500 |
| 78 | Michael Pintinalli | 3.000 | 67.000 |
| 79 | Richard Piotrowski | 194.000 | 0 |
| 80 | Vincent Piscotta | 83.000 | 76.000 |
| 81 | Ted Pogorzellski | 121.000 | 74.500 |
| 82 | John Powlish | 75.500 | 0 |
| 83 | Michael Presseau | 84.500 | 113.000 |

| 84 | Vincent Radice | 34.000 | 15.000 |
|---|---|---|---|
| 85 | Carmen Rettzo | 93.500 | 17.000 |
| 86 | Elizabeth Roberts | 38.500 | 60.500 |
| 87 | Michael Rogalski | 164.500 | 0 |
| 88 | Jason Salvatore | 123.500 | 120.000 |
| 89 | Patricia Samonski | 54.000 | 49.000 |
| 90 | Richard Samonski | 87.000 | 58.000 |
| 91 | Anibal Santos | 216.000 | 180.000 |
| 92 | Scott Schoellkopf | 309.000 | 116.500 |
| 93 | Dennis Schuster | 8.000 | 0 |
| 94 | Aaron Scholnick | 0 | 37.000 |
| 95 | Joseph Seals | 97.500 | 26.500 |
| 97 | John Seals | 166.500 | 112.000 |
| 98 | David Seidorf | 263.000 | 149.500 |
| 99 | Jessica Senese | 269.000 | 134.000 |
| 100 | Robert Septak | 137.000 | 251.500 |
| 101 | Robert Smith | 199.500 | 89.000 |
| 102 | David Smithson | 240.000 | 241.500 |
| 103 | Richard Soto | 48.500 | 28.000 |
| 104 | Jeremy Stewart | 475.000 | 464.000 |
| 105 | Thomas Sweeney | 66.000 | 79.000 |
| 106 | John Szarka | 124.500 | 0 |
| 107 | Michael Szczepanski | 1.000 | 0 |
| 108 | James Taylor | 0 | 0 |
| 109 | Christopher Tighe | 13.500 | 64.500 |
| 100 | Dennis Tobolski | 0 | 0 |
| 111 | Paul Toth | 588.500 | 194.500 |
| 112 | James UdiJohn | 221.500 | 190.000 |
| 113 | Dennis Unger | 153.500 | 78.000 |
| 114 | Vito Vacirca | 52.000 | 32.750 |
| 115 | Deana Walls | 91.000 | 0 |
| 116 | Brian Walsh | 253.000 | 263.500 |
| 117 | Jared Walulak | 99.500 | 97.000 |
| 118 | Kristi Weeden | 0 | 24.000 |
| 119 | Charles Werts | 95.000 | 72.500 |
| 120 | Michael Winget | 23.000 | 16.000 |
| 121 | Dean Wylie | 212.000 | 388.500 |
| 122 | Raymond Wysokowski | 66.000 | 100.000 |
| | **Totals** | 14453.5 | 10933.099 |
| | **Average Per Officer** | 118 | 94 |

RIDER C

| NAME | SENIORITY | TITLE | OVERTIME | TOTALS | MISC. |
|---|---|---|---|---|---|
| | | Transportation | | | |
| William J. Chalker | Number 6 on the Seniority List 6/15/92 | Sheriff's Officer Transportation Officer | 262 hours-2010 year | $17,441.79 | Race-White Gender-Male |
| George A. Hendersen Sr. 11/03/97 | Number 8 on the seniority List Transportation Officer | Sheriff's Officer | 277.500 hours 2010 year | $18,370.69 | Race-Black Gender-Male |
| Kelly L. Goguen 09/03/08 | Number 78 on the seniority List. Transportation Officer | Sheriff's Officer Transportation Officer 721 hours of Training | Averua 23.5 2010 hours 2010 year County paid Training $18,527.64 | $1,705-Averua $1,115 Gr.93 $18,527.64 | Race-White Gender-Female |
| Christopher M. Gwegg 08/27/01 | Number 22 on seniority List Transportation Officer | Sheriff's Officer Transportation Officer | Averua-15hrs. 116,500 Thunder 84 year 2010 | $450 $116541.96 $3,665.76 | Race-White Gender-Male |
| Phillip R. Meisner Jr. | Sheriff's Officer Transportation Officer List | Number 68 on the seniority List | 52.5 Training 28 hours | $1135 $3,458.28 $1,221.92 | Race-White Gender-Male |

Transportation

| NAME | SENIORITY | TITLE | OVERTIME | TOTALS | MISC. |
|---|---|---|---|---|---|
| Ryan P. Hoy | Number 55 on the Seniority List. 01/22/07 | Sheriff's Officer Transportation Officer Senior Court Officer | 109 hours - 2010 year | $41,540.94 | Race - White Gender - Male |
| Matthew Dillon | Number 60 on the Seniority List. 09/01/07 | Sheriff's Officer Transportation Officer | 93 hours - 2010 year | $6,087.78 | Race - White Gender - Male |
| Elizabeth A. Roberts | Number 44 on the seniority List. 04/11/05 | Sheriff Officer Transportation Officer Senior Court Officer | Arenilla 4/15 60.5 Hrs. 2010 year | $1,245. $12,935.61 | Race - White Gender - Female Received Prosecutorial Office Training |
| Tara L. Hendryx | Number 77 on the seniority List. 09/03/08 | Sheriff Officer Transportation Officer, Senior Court Officer Training Officer | 16 hours 2010 training - 140 hrs 2010 year | $616.70 $3,597.66 | Race - White Gender - Female Received County Training |

Prepared 9/26/16. 12 40 40
Program PR70AL
MERCER COUNTY, NEW JERSEY
Dp/Dv/Act #041-42J CONSTITUTIONAL/SHERIFF/PUBLIC SAFETY ... RIES

... History Detail

Starting date  1/...
Ending  12/31/...

T&P0001726

| Employee | Description | Quantity | Amount |
|---|---|---|---|
| ALLEN, LENORA R | DEATH IN FAMILY | 35.000 | 908.40 |
| | OVERTIME | 19.000 | 760.76 |
| | PERSONAL | 21.000 | 545.04 |
| | REGULAR HOURS | 463.500 | 38,503.17 |
| | SICK | 112.500 | 2,719.84 |
| | VACATION | 175.000 | 4,542.00 |
| | | 1,045.000 | 48,179.21 |
| ALTOBELLI, PHILLIP M | OVERTIME | 43.500 | 1,947.66 |
| | PERSONAL | 21.000 | 626.82 |
| | REGULAR HOURS | 1,524.000 | 48,474.08 |
| | SICK | 94.500 | 2,020.69 |
| | THUNDER | .000 | 120.00 |
| | VACATION | 87.500 | 2,611.75 |
| | | 1,870.500 | 56,601.00 |
| ANDERSON, GLORIA | FMLA SICK | 105.000 | 4,582.20 |
| | FMLA VACATION | 28.000 | 1,221.92 |
| | OVERTIME | 101.500 | 5,757.19 |
| | PERSONAL | 21.000 | 916.44 |
| | REGULAR HOURS | 1,440.500 | 62,563.42 |
| | SICK | 78.500 | 3,425.74 |
| | VACATION | 154.000 | 6,720.56 |
| | | 1,928.500 | 86,487.47 |
| ARMAND, JOSEPH | ARENA | 137.500 | 4,125.00 |
| | MISC SHERIF | .000 | 545.00 |
| | OVERTIME | 255.500 | 13,098.70 |
| | PERSONAL | 21.000 | 707.34 |
| | REGULAR HOURS | 1,667.000 | 56,149.96 |
| | SICK | 34.000 | 1,145.23 |
| | THUNDER | .000 | 450.00 |
| | VACATION | 105.000 | 3,536.70 |
| | | 2,220.000 | 79,757.31 |
| ARMITAGE JR., BRUCE W | ARENA | 37.500 | 1,125.00 |
| | OVERTIME | 72.000 | 4,212.61 |
| | PERSONAL | 21.000 | 609.92 |
| | REGULAR HOURS | 1,605.000 | 41,706.23 |
| | SICK | 96.000 | 3,702.45 |
| | THUNDER | .000 | 260.00 |
| | VACATION | 105.000 | 4,649.55 |
| | | 1,936.500 | 78,160.01 |
| BARBATO, CARMEN M | OVERTIME | 62.000 | 4,135.25 |
| | PERSONAL | 21.000 | 916.44 |
| | REGULAR HOURS | 1,592.500 | 69,540.24 |
| | SICK | 72.500 | 2,163.90 |
| | VACATION | 140.000 | 6,109.60 |
| | | 1,889.000 | 83,865.53 |

Prepared 2/30/11, 18:06:23

Hours History Detail

Starting Page 2
Ending 1/08/10
12/23/10

HUDSON COUNTY, NEW JERSEY
Dp/Dv/Ac CONSTITUTIONAL/SHERIFF/PUBLIC SAFETY SALARIES

| Employee | Description | Quantity | Amount |
|---|---|---|---|
| ALLEN, LENORA R | DOCK HOURS | 14.000 | .00 |
| | PERSONAL | 10.500 | 280.69 |
| | REGULAR HOURS | 723.750 | 19,347.92 |
| | SICK | 53.250 | 1,423.53 |
| | VACATION | 80.500 | 2,151.99 |
| | | 882.000 | 23,204.13 |
| ALTOBELLI, PHILLIP M | CONVENTION/SEMINAR/TRNG | 7.000 | 208.74 |
| | PERSONAL | 21.000 | 626.82 |
| | REGULAR HOURS | 1,554.000 | 46,384.68 |
| | SICK | 84.000 | 2,507.28 |
| | THANDER | .000 | 135.00 |
| | VACATION | 84.000 | 2,507.28 |
| | | 1,750.000 | 52,370.00 |
| ANDERSON, GLORIA | OVERTIME | 52.500 | 3,473.18 |
| | PERSONAL | 21.000 | 916.44 |
| | REGULAR HOURS | 1,520.000 | 66,332.80 |
| | SICK | 90.000 | 3,927.60 |
| | VACATION | 119.000 | 5,193.16 |
| | | 1,802.500 | 79,843.18 |
| ARMAND, JOSEPH | ARENA | 103.250 | 3,097.50 |
| | CONVENTION/SEMINAR/TRNG | 63.000 | 2,122.02 |
| | JURY DUTY | 7.000 | 235.76 |
| | MISC SHERIFF | .000 | 1,700.00 |
| | OVERTIME | 199.500 | 10,227.75 |
| | PERSONAL | 21.000 | 707.24 |
| | REGULAR HOURS | 1,484.000 | 50,082.74 |
| | SICK | 26.000 | 875.79 |
| | THANDER | .000 | 420.00 |
| | UNION TIME OFF | 14.000 | 471.86 |
| | VACATION | 132.000 | 4,479.62 |
| | | 2,052.750 | 74,390.26 |
| ARMITAGE JR., BRUCE W | CONVENTION/SEMINAR/TRNG | 48.000 | 1,619.82 |
| | OVERTIME | 30.000 | 1,735.33 |
| | PERSONAL | 21.000 | 809.91 |
| | REGULAR HOURS | 1,513.500 | 58,371.39 |
| | SICK | 85.000 | 3,413.20 |
| | VACATION | 83.000 | 3,278.21 |
| | | 1,780.000 | 69,247.86 |
| BARBATO, CARMEN M | CONVENTION/SEMINAR/TRNG | 42.000 | 1,832.88 |
| | OVERTIME | 33.500 | 1,568.33 |
| | PERSONAL | 21.000 | 916.44 |
| | REGULAR HOURS | 1,538.000 | 67,118.32 |
| | SICK | 51.000 | 2,225.64 |
| | VACATION | 98.000 | 4,276.72 |
| | | 1,803.500 | 79,938.33 |